# United States Court of Appeals

### *for the*

# Seventh Circuit

---

Case No. 25-2959

MELISSA TEMPEL,

*Plaintiff-Appellant,*

– v. –

SCHOOL DISTRICT OF WAUKESHA and JAMES SEBERT,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN IN CASE NO. 2:23-CV-01169-NJ
THE HONORABLE NANCY JOSEPH, JUDGE PRESIDING

## BRIEF OF DEFENDANTS-APPELLEES
## SCHOOL DISTRICT OF WAUKESHA AND JAMES SEBERT

JOEL S. AZIERE
CHRISTINA A. KATT
HUNTER M. CONE
BUELOW VETTER BUIKEMA OLSON
  & VLIET, LLC
*Attorneys for Defendants-Appellees*
20855 Watertown Road, Suite 200
Waukesha, Wisconsin 53186
(262) 364-0300

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: 25-2959

Short Caption: Tempel v School District of Waukesha, et al

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[X] **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
School District of Waukesha and James Sebert

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Buelow Vetter Buikema Olson & Vliet, LLC

(3)     If the party, amicus or intervenor is a corporation:

i)      Identify all its parent corporations, if any; and
N/A

ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:
N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:
N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:
N/A

Attorney's Signature: /s/ Joel S. Aziere     Date: January 26, 2026

Attorney's Printed Name: Joel S. Aziere

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** [X] **No** [ ]

Address: 20855 Watertown Road, Suite 200

Waukesha, WI 53186

Phone Number: (262) 364-0300     Fax Number: (262) 364-0320

E-Mail Address: jaziere@buelowvetter.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2959

Short Caption: Tempel v School District of Waukesha, et al

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

School District of Waukesha and James Sebert

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Buelow Vetter Buikema Olson & Vliet, LLC

(3)    If the party, amicus or intervenor is a corporation:

i)    Identify all its parent corporations, if any; and

N/A

ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Hunter M. Cone      Date: January 28, 2026

Attorney's Printed Name: Hunter M. Cone

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes [ ]  No [✓]

Address: 20855 Watertown Road, Suite 200

Waukesha, WI 53186

Phone Number: (262) 364-0300      Fax Number: (262) 364-0320

E-Mail Address hcone@buelowvetter.com

rev. 12/19 AK

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>25-2959</u>

Short Caption: <u>Tempel v School District of Waukesha, et al</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>School District of Waukesha and James Sebert</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Buelow Vetter Buikema Olson & Vliet, LLC</u>

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Christina A. Katt</u>      Date: <u>November 13, 2025</u>

Attorney's Printed Name: <u>Christina A. Katt</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐   **No** ☑

Address: <u>20855 Watertown Road, Suite 200</u>

        <u>Waukesha, WI 53186</u>

Phone Number: <u>(262) 364-0300</u>      Fax Number: <u>(262) 364-0320</u>

E-Mail Address: <u>ckatt@buelowvetter.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................ vi

PREFACE ............................................................................................1

JURISDICTIONAL STATEMENT ...................................................4

ISSUES PRESENTED FOR REVIEW ...............................................4

STATEMENT OF THE CASE .............................................................5

    I.      FACTUAL BACKGROUND ...................................................5

          A.    Ms. Tempel's Employment With The District ...................5

          B.    Mr. Ziegler's And Mr. Schneider's Planning Of The Spring Concert And Song Selection Process ...................5

          C.    Ms. Tempel's Misguided Public Social Media Campaign ................6

          D.    Ms. Tempel's Escalation Of Public Commentary And Media Attention Resulted In Various Threats, Safety Concerns, Operational Disruption, Internal Disharmony, And Community Fallout ..........................9

          E.    Ms. Tempel Was Placed On Administrative Leave And An Investigation Into Her Disruptive Actions Was Commissioned ..........................12

    II.      PROCEDURAL BACKGROUND ...................................................14

SUMMARY OF THE ARGUMENT ...................................................16

ARGUMENT .......................................................................................19

    I.      STANDARD OF REVIEW ...................................................19

    II.     THE DISTRICT COURT'S JUDGMENT SHOULD BE AFFIRMED BECAUSE MS. TEMPEL DID NOT SPEAK ON A MATTER OF PUBLIC CONCERN. ..........................22

    III.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE DISTRICT BECAUSE, UNDER THE *PICKERING* BALANCING TEST, THE DISTRICT'S INTEREST SUBSTANTIALLY OUTWEIGHS APPELLANT'S INTEREST ...................28

A.    The District Court Properly Valued Ms. Tempel's Interest When Conducting Its *Pickering* Analysis..............................................31

    1.    The District Court Correctly Concluded Ms. Tempel's Speech Did Not Arise From Specialized Knowledge ........................................................................31

    2.    The District Court Applied The Correct First Amendment Standard To Ms. Tempel When Conducting Its First Amendment Analysis ..........................35

    3.    The District Court Correctly Found Ms. Tempel's Widespread Use of Social Media and Media Outlets Amplified Her Speech In A Manner That Significantly Increased the Risk of Disruption ......................38

B.    The District Court Properly Valued The District's Interest When Conducting The *Pickering* Balancing .......................................41

    1.    The District Court Applied The Correct Summary Judgment Standard...................................................41

    2.    The District Court Properly Conducted The *Pickering* Balancing Test ...........................................41

    3.    The District Court Did Not Err In Recognizing The Actual And Potential Disruption Resulting From Appellant's Speech ...................................................44

    4.    The District Court Properly Considered the Undisputed Evidence Establishing Staff Disharmony Resulting from Appellant's Speech..................50

    5.    Ms. Tempel's Termination Was The Result Of Her Actions, Including The Disruption And Disharmony Resulting From Those Actions..........................52

CONCLUSION .......................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1968) ................................................................................................... 20

*Brown v. Hartlage,*
456 U.S. 45 (1982) ..................................................................................................... 24

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................................... 20

*Chaklos v. Stevens,*
560 F.3d 705 (7th Cir. 2009) ..................................................................................... 50

*Connick v. Myers,*
461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ...................................... 23, 51

*Craig v. Rich Twp. High Sch. Dist. 227,*
736 F.3d 1110 (7th Cir. 2013) ................................................................................... 46

*Darlingh v. Maddaleni,*
142 F.4th 558 (7th Cir. 2025) ................................................................. 29, 34, 42, 50

*Fitzgerald v. Santoro,*
707 F.3d 725 (7th Cir. 2013) ..................................................................................... 20

*Garcetti v. Ceballos,*
547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) .............................. 21, 29, 42

*Gustafson v. Jones,*
290 F.3d 895 (7th Cir. 2002) ..................................................................................... 23

*Harper v. C.R. Eng., Inc.,*
687 F.3d 297 (7th Cir. 2012) ..................................................................................... 20

*Hedgepeth v. Britton,*
152 F.4th 789 (7th Cir. 2025) ............................................................................ *passim*

*Heft v. Moore,*
351 F.3d 278 (7th Cir. 2003) ..................................................................................... 20

*Hicks v. Ill. Dep't of Corr.,*
109 F.4th 895 (7th Cir. 2024) ................................................................................... 19

vi

*Hoffstead v. Ne. Reg'l Commuter R.R. Corp.,*
    132 F.4th 503 (7th Cir. 2025) .........................................................................19-20

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) .......................................................................................47, 48

*Khuans v. Sch. Dist. 110,*
    123 F.3d 1010 (7th Cir. 1997) ......................................................................49, 51

*Knapp v. Whitaker,*
    757 F.2d 827 (7th Cir. 1985) ...............................................................................53

*Liverman v. City of Petersburg,*
    844 F.3d 400 (4th Cir. 2016) ...............................................................................38

*Makowski v. SmithAmundsen LLC,*
    662 F.3d 818 (7th Cir. 2011) ...............................................................................20

*Marshall v. Allen,*
    984 F.2d 787 (7th Cir.1993) ................................................................................23

*McGreal v. Ostrov,*
    368 F.3d 657 (7th Cir. 2004) .........................................................................21, 29

*Melzer v. Bd. of Educ. of the City Sch. Dist. of N.Y.,*
    336 F.3d 185 (2d Cir. 2003) ................................................................................37

*New York Times v. Sullivan,*
    376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)..........................................25

*Pickering v. Board of Education,*
    391 U.S. 563 (1968)..................................................................................... *passim*

*Rankin v. McPherson,*
    483 U.S. 378 (1987)..............................................................................................42

*Roake v. Forest Preserve District of Cook County,*
    849 F.3d 342 (7th Cir. 2017) ...............................................................................21

*Spiegla v. Hull,*
    371 F.3d 928 (7th Cir. 2004) ...............................................................................21

*Thomas v. Ragland,*
    324 F. Supp. 2d 950 (W.D. Wis. 2004)...............................................................25

*Watkins v. Kasper,*
    599 F.3d 791 (7th Cir. 2010) ...............................................................................21

**Statutes & Other Authorities:**

U.S. Const., Amend. I ................................................................................ *passim*

42 U.S.C. § 1983 .......................................................................................14

Circuit Rule 28(b) ......................................................................................4

Fed. R. App. P. 28(a)(4)(A)-(D) ............................................................... 4

Fed. R. App. P. 28(b)(1) .............................................................................4

Fed. R. Civ. P. 56(c) .................................................................................20

"Guidance Counselor," Merriam-Webster..............................................34

## PREFACE

Nearly three years ago, the Appellees, Waukesha School District (the "District") and Dr. James Sebert (collectively "Appellees" or the "District") were thrust into a national controversy, triggering severe security threats, widespread disruption, and an inability to provide public services in a normal or effective manner. These consequences were not the result of any official District action but instead flowed from a false and inflammatory narrative created and advanced through social media and news interviews by Appellant, Melissa Tempel ("Appellant" or "Ms. Tempel"), a District teacher at the time.

Appellant falsely accused the District of waging a "war on rainbows," first claiming administrators had "banned" the song "Rainbowland" by Miley Cyrus and Dolly Parton from a first-grade spring concert, then claiming "Rainbow Connection" by the Muppets had been "banned." However, Ms. Tempel's narrative was entirely fabricated. By Ms. Tempel's own admission, her spurious claims rested entirely on assumption and speculation, not fact. And when given multiple opportunities to correct her known falsehoods, Ms. Tempel instead chose to double down on her distorted and unfounded claims.

Compounding the harm, Ms. Tempel explicitly identified herself as a District teacher while promoting this false narrative, lending it unwarranted credibility and magnifying its impact. The result was predictable and severe: hundreds of hostile

1

communications, credible threats, heightened security concerns, and disruption and disharmony throughout the District's schools and operations. A sampling is as follows:

1. "Hey, I heard your school district doesn't like gay people. Fuck you, you fucking retards! Kill yourselves!"
2. "Religious based cultural ignorance-how stupid this is. You are small mindless assholes. Consider changing this or face the consequences,"
3. "You are a fucking cunt for working for that pig. Rot in hell!"
4. Suggesting the District should be the target of the next school shooter.

Based on the substantial disruption caused by Ms. Tempel's actions, the District Court correctly entered summary judgment for Appellees under the *Pickering* balancing test. This demonstrable substantial disruption dooms Ms. Tempel on appeal. And while the District respectfully requests this Honorable Court affirm the lower's court's decision, the District also affirmatively asserts judgment may be entered in the District's favor on the independent ground that Appellant's speech was not protected at all because the speech consisted of a false and fabricated narrative and Ms. Tempel did not speak on a matter of public concern.

In the spring of 2023, Ms. Tempel took to Twitter and posted, from the Twitter Handle "Maestra (i.e., "Teacher") Melissa" to complain about the song selection for a school concert.  Specifically, Ms. Tempel was upset over the decision not to have first grade students perform "Rainbowland" during said concert. Of course, a local elementary school's internal decision not to include a particular song in a first-grade concert does not implicate public policy, political debate, or community oversight. It is, at most, a workplace grievance. And in this case, said grievance was amplified by

knowingly providing misinformation. Ms. Tempel made this rant personal. Along with making reference to "My first graders," "our spring concert", and the decision by "our administration"; Ms. Tempel included "@waukeshaschools" in the posts. When she is posting to the public, Ms. Tempel openly admits "I'm always a teacher, so when I'm speaking on a personal – giving personal – my personal perspective, it's still as a teacher." These actions by Ms. Tempel made the District a prime target for the abusive behavior outlined above.

Ms. Tempel claims her posts were related to the District's Controversial Issues Policy, which she claims had garnered widespread public attention. However, by her own admission, none of Ms. Tempel's social media posts made any reference to said policy or even hinted at the policy. Moreover, as explained above, Ms. Tempel had created a false narrative wholly devoid of the truth. One simply cannot fabricate a story, then claim said fallacy is a matter of public concern. While Ms. Tempel's subsequent news media appearances made reference to the policy, by that time it was too late. The damage of the false narrative was done. And not once during that time did Ms. Tempel even attempt to correct the false narrative she had created.

The District Court correctly recognized the consequences of Ms. Tempel's conduct. Her media campaign created an onslaught of emails, calls, and social media posts, many violent and threatening in nature, and all directed at the District and its staff. The resulting disruption undermined employee harmony, compromised school

safety, and diverted substantial resources away from education. These are core governmental interests, especially in a public education setting.

In light of the consequences of Ms. Tempel's actions, the District and Dr. Sebert (in his official capacity) took needed and measured steps to address the safety concerns and disruption. Under the applicable *Pickering* balancing test, the District Court correctly determined the District's interests in maintaining effective and efficient public services far outweighed Ms. Tempel's interest in her substantially disruptive speech.

The undisputed facts simply do not support Ms. Tempel's request for reversing the District Court's order granting Appellees' Motion for Summary Judgment. The District Court identified the correct legal standards and faithfully applied them to the record. This Honorable Court should affirm the lower court's decision.

## JURISDICTIONAL STATEMENT

As required by Circuit Rule 28(b), Appellee states the Plaintiff-Appellant's Jurisdictional Statement is complete and correct. See F.R.A.P. 28(a)(4)(A)-(D) and (b)(1) and Circuit Rule 28(b).

## ISSUES PRESENTED FOR REVIEW

1.    Whether, despite properly granting Appellees' Motion for Summary Judgement, the District Court erred in finding Appellant's speech was on a matter of public concern when the "matter" on which she spoke was a false narrative of her own creation.

2.     Whether the District Court properly granted Appellees' Motion for Summary Judgment where, the undisputed record establishes Appellant's speech caused substantial safety concerns, operational disruption, and internal disharmony among District staff.

## STATEMENT OF THE CASE

### I.     FACTUAL BACKGROUND.

#### A.     Ms. Tempel's Employment With The District.

Ms. Tempel served as a first-grade dual language teacher at Heyer Elementary School in the School District of Waukesha from the 2018 academic year until July 12, 2023, when the District conducted a termination hearing and voted to end the employment relationship. [ECF Dkt. #1, ¶7; Tempel Tr.,76:16 – 77:1]. During her employment with the District, Ms. Tempel did not hold any other positions.

#### B.     Mr. Ziegler's And Mr. Schneider's Planning Of The Spring Concert And Song Selection Process.

In early 2023, Jared Ziegler, the music teacher at Heyer Elementary School, began planning the annual spring concert for kindergarten and first-grade students, including students taught by Ms. Tempel. [ECF Dkt. #1, ¶ 29]. While Ms. Tempel's students were involved in the annual spring concert, Ms. Tempel herself did not participate in the song selection for the concert. Song selection rested solely with Mr. Ziegler.

On March 20, 2023, while considering song selection for the concert, Mr. Ziegler emailed Ms. Tempel and fellow first-grade teacher Angie Aranda, proposing several

songs, including "Rainbowland" by Dolly Parton and Miley Cyrus. [ECF Dkt. #1, ¶¶ 31-33; ECF Dkt. #33, Schneider Tr., 42:16-19; ECF Dkt. #67 Aziere Decl. ¶18, Ex. O]. Later that day, Mr. Ziegler sought guidance from Heyer Elementary School Principal Mark Schneider regarding whether "Rainbowland" was appropriate for a first-grade concert. [ECF Dkt. #1, ¶¶ 31-33; ECF Dkt. #33, Schneider Tr.,42:16-19; ECF Dkt. #67, Aziere Decl. ¶18, Ex. O].

Following internal discussions, Mr. Schneider advised Mr. Ziegler it would be best to select a different song for the concert. [ECF Dkt. #33, Schneider Tr., 42:16-19-44:22-24]. Mr. Schneider's concern was whether a Miley Cyrus song was appropriate for children of such a young age. [ECF Dkt. #33, Schneider Tr., 104:19-105:12]. The song's lyrics posed no issue. It was the images of Miley Cyrus Mr. Schneider found online that caused him pause. [*Id*.]. As a replacement, Mr. Ziegler proposed "Rainbow Connection," by the Muppets which Mr. Schneider approved. [ECF Dkt. #33, Schneider Tr., 47:12-14]. Mr. Ziegler emailed the first-grade teaching staff at Heyer Elementary School on March 21, 2023, stating "Rainbowland is out. Rainbow Connection is in." [ECF Dkt. #33, Schneider Tr., 42:16-19; ECF Dkt. #67, Aziere Decl. ¶9, Ex. G].

## C.     Ms. Tempel's Misguided Public Social Media Campaign.

Ms. Tempel was one of the first-grade teachers who received Mr. Ziegler's March 21, 2023, email stating, "Rainbowland is out. Rainbow Connection is in." [ECF Dkt. #33, Schneider Tr., 42:16-19; ECF Dkt. #67, Aziere Decl. ¶9, Ex. G; ECF Dkt. #60, ¶15]. On that

same day, Mr. Ziegler spoke with Ms. Tempel and Ms. Aranda and explained Principal Schneider took issue with Rainbowland because he questioned whether Miley Cyrus was appropriate for first graders. [ECF Dkt. #60, ¶16]. Despite having all this information, later that same day Ms. Tempel tweeted about "[m]y first graders," tagging the District and several public figures:

> My first graders were so excited to sing Rainbowland for our spring concert but it has been vetoed by our administration. When will it end? @waukeshaschools @DollyParton @MileyCyrus @mileyworld @gsafewi @CivilRights #publicschools

[ECF Dkt. #1, ¶40].

The next day, March 22, 2023, armed with all the information outlined above, Ms. Tempel posted a follow-up tweet:

> The song Rainbow Connection from the Muppet Movie has also been taken off our spring concert list now. #muppets #jimhenson #publicschools @DollyParton @MileyCyrus @billyraycyrus @waukeshaschools @ACLULGBT

[ECF Dkt. #67, Aziere Decl. ¶13, Ex. K].

At the time she posted the tweet, Ms. Tempel has received an email from Mr. Schneider saying "Rainbowland is out. Rainbow Connection is in."  Ms. Tempel was also well aware the issue with Rainbowland was not rainbows, was not the song's lyrics, but instead was concern over whether Miley Cyrus was appropriate for first-grade students. Despite this knowledge, Ms. Tempel took this opportunity to advance a

false narrative that the District was waging war on rainbows. For instance, Appellant engaged with a response from @jfroh:

> @jfroh: WTF? Seems like a beautiful, loving song to me. What was the reason for denial? The rainbow represents LBGTQ+?
>
> Ms. Tempel: Today they banned Rainbow Connection, so it seems the reason is rainbows.

[ECF Dkt. #67, Aziere Decl. ¶13, Ex. K].

Ms. Tempel's representations to the public, including members of the local community, were unsupported, at best and more likely knowingly false. Ms. Tempel had been told by Mr. Ziegler the decision was made because of a concern that Miley Cyrus was not an appropriate role model for first grade students. [ECF Dkt. #60, ¶16; ECF Dkt. #33, Schneider Tr., 104:19-105:12]. Ms. Tempel had no basis for her statements. Ms. Tempel made no efforts to seek verification of her statements before authoring her posts and partaking in news outlet interviews. Ms. Tempel had been told by Mr. Ziegler why Rainbowland as an issue. And Ms. Tempel admits she did nothing to investigate the issue or even discuss it with the administration. [ECF Dkt. #48, Tempel Tr., 204:25-206:22]. Ms. Tempel's statements were entirely misleading and wrong – with a goal to push an agenda, not facts.

On March 23, 2023, Mr. Schneider and Mr. Ziegler discussed the theme of the concert and finalized the list of proposed songs. [ECF Dkt. #33, Schneider Tr., 47:23 – 48:4].

**D.    Ms. Tempel's Escalation Of Public Commentary And Media Attention Resulted In Various Threats, Safety Concerns, Operational Disruption, Internal Disharmony, And Community Fallout.**

Despite having the knowledge outlined above and despite numerous opportunities to gather further information regarding the song selection, Ms. Tempel did nothing but continue expressing her false grievances on Twitter, which, at this point, took a turn and began including explicit references to her classroom:

@MelissaMBrewers: How many students are in your class?

Ms. Tempel: 24 but there are about 65 first graders in total.

[ECF Dkt. #67, Aziere Decl. ¶13, Ex. K].

Ms. Tempel's tweets and various interviews gained national attention and led to coverage by local and national news outlets. [ECF Dkt. #1, ¶¶41, 44]. As a result of the national attention generated by Ms. Tempel's public campaign of falsely accusing the District of waging war on rainbows, the District received an unprecedented volume of emails, calls, and voicemails, many of which were vulgar and threatening. These messages were far from innocent or mere criticisms. Rather, these messages raised significant safety concerns for the community, the students, and the staff. The district court properly quoted some of the most egregious statements:

1. "Hey, I heard your school district doesn't like gay people. Fuck you, you fucking retards! Kill yourselves!"
2. "Religious based cultural ignorance-how stupid this is. You are small mindless assholes. Consider changing this or face the consequences,"
3. "You are a fucking cunt for working for that pig. Rot in hell!"

9

[ECF Dkt. #106, p. 6] (citing ECF Dkt. #67, Aziere Decl. ¶15, Ex. M).

The threatening messages escalated to the point of one social media poster suggesting the District should experience a tragedy like the recent school shooting in Nashville, Tennessee. [ECF Dkt. #67, Aziere Decl. ¶2, Ex. B].

The community felt the threats resulting from Ms. Tempel's public statements and her false narrative. Several families expressed concerns about sending their kids to school. [ECF Dkt. #38, Sebert Tr, 200:6-201:15]. First-grade teacher, Mary Dellar, contacted the District to voice her concerns about "the safety and privacy of the students in [her] classroom, the rest of the first graders, and our entire school of students and staff as we return to school on Monday. . .." [ECF Dkt. #67, Aziere Decl. ¶6, Ex. D]. Ms. Dellar was not alone in her fears, District employees Chelsea Hanson, Kristy Spellman, and Mariza Nesthus all contacted the District expressing palpable fears for the safety of the classroom and the community. [ECF Dkt. #67, Aziere Decl. ¶¶3, 7-8, 11-12, Exs. A, E, F, I, J].

District staff were not the only ones expressing serious concerns in the wake of Ms. Tempel's public speech. On March 31, 2023, Amy Davis, a parent of a Heyer Elementary School student, wrote to the District expressing her concern "for the safety of the children." [ECF Dkt. #67, Aziere Decl. ¶5, Ex. C].

The District was forced to act to address the growing safety concerns. Dr. Sebert emailed the *entire* Heyer Elementary School staff on April 1, 2023, emphasizing that

"safety and security of our Heyer community is priority number one." [ECF Dkt. #67, Aziere Decl. ¶10, Ex. H]. The public assurance did not assuage the disruption caused by Ms. Tempel's actions.

District leadership diverted substantial time and resources away from normal operations to address the widespread concerns. Dr. Sebert worked most of spring break addressing media attention and safety planning. [ECF Dkt. #38, Sebert Tr., 144:16-145:4; ECF Dkt. #35, Ettinger Tr., 60:3-12; ECF Dkt. #34, Chaparro Tr., 24:4-25:15; ECF Dkt. # 33, Schneider Tr., 31:25-32:10]. Principal Schneider, who was supposed to be on vacation, was forced to spend nearly three hours a day reviewing emails and voicemails related to Ms. Tempel's tweets, along with having conversations with Dr. Sebert, Dr. Koch, and Sharon Thiede making plans to ensure the District addressed all safety concerns of parents and staff in anticipation of the students' return to school. [ECF Dkt. # 33, Schneider Tr., 152:4 – 154:7].

The disruption to regular operations significantly impacted Sue Ettinger, the Executive Assistant to the Superintendent and Board Secretary. Ms. Ettinger was unable to complete her regular duties because she was inundated with an overwhelming volume of messages received as a result of Ms. Tempel's actions. [ECF Dkt. #35, Ettinger Tr., 60:3-12]. Immediately following Ms. Tempel's tweets, Ms. Ettinger spent the majority of her days receiving calls and voicemails related to said tweets. [ECF Dkt. #35, Ettinger Tr., 60:3-12].

11

Ms. Chaparro, the bilingual Secretary to the Principal at Heyer Elementary School, also experienced significant disruption to her work. While on vacation during spring break, she continued to receive messages stemming from Ms. Tempel's actions, testifying during her deposition she received approximately 15 to 20 calls per day about "Rainbowland" in the week following spring break, disrupting her ability to perform her regular job duties. [ECF Dkt. #34, Chaparro Tr., 24:4-25:15, 27:6-20; 80:18-81:3].

Along with the severe safety concerns created by Ms. Tempel, the disruption extended directly into the District's workforce, creating disharmony among staff. [ECF Dkt. #34, Chaparro Tr., 75:24-78:10]. Mr. Schneider specifically noticed the first-grade team was not able to work collaboratively. [ECF Dkt. #33, Schneider Tr., 129:23 – 130:15]. Mr. Schneider's observation was fully supported by Ms. Dellar's testimony that Ms. Tempel's speech had caused significant friction within the District, causing her to change her classroom habits to close the blinds to prevent her students from being exposed to news outlets filming Heyer Elementary. [ECF Dkt. #49, Dellar Tr., 65:10-22]. Ultimately, Ms. Tempel's actions caused so much disharmony among her first-grade team that Ms. Dellar left the District. [ECF Dkt. #49, Dellar Tr., 22:3-23:5].

### E.     Ms. Tempel Was Placed On Administrative Leave And An Investigation Into Her Disruptive Actions Was Commissioned.

Upon students' return from spring break on April 3, 2023, the District placed Ms. Tempel on paid administrative leave and initiated an investigation into Ms. Tempel's actions and the impact on her classroom. [ECF Dkt. #67, Aziere Decl. ¶14, Ex. L].

Ultimately, the investigation found that, despite never discussing the song choice decision with the decision-makers at the District, Ms. Tempel took to the media to proffer a false narrative. [ECF Dkt. #67, Aziere Decl. ¶14, Ex. L]. Ms. Tempel's public statements were deliberately, and the very least, recklessly false. [ECF Dkt. #67, Aziere Decl. ¶14, Ex. L].

Following the investigation, the District found Ms. Tempel violated Page 7 of the Employee Handbook for Professional Staff Members, Board Policy 3170 ["Employee Concerns"], Board Policy 3213 ["Student Supervision and Welfare"], and Board Policy 3310 ["Employee Expression in Noninstructional Settings"]. [ECF Dkt. #67, Aziere Decl. ¶14, Ex. L]. In short, the investigation concluded Ms. Tempel was "entitled to disagree with the decision of the District related to the use of the song 'Rainbowland' at the Heyer concert. However, the manner in which Ms. Tempel was to express her disagreement with the District's decision was inappropriate, disruptive, and in violation of various District policies." [ECF Dkt. #67, Aziere Decl. ¶14, Ex. L].

Ms. Tempel's actions caused significant disruption to the school environment, including numerous messages and emails containing vulgar and threatening language. [ECF Dkt. #67, Aziere Decl. ¶14, Ex. L]. Her comments raised safety concerns among employees at Heyer Elementary School. [ECF Dkt. #67, Aziere Decl. ¶6, Ex. D; ECF Dkt. #67, Aziere Decl. ¶¶7-8, 12, Exs. E, F, J; ECF Dkt. #67, Aziere Decl. ¶3, Ex. A; ECF Dkt. #67, Aziere Decl. ¶11, Ex. I]. Ms. Tempel's actions disrupted workplace harmony and

undermined collaboration among first-grade teachers, contrary to District expectations. [ECF Dkt. # 33, Schneider Tr., 129:23-130:15].

Dr. Sebert adopted the findings and conclusions of the investigation report, and informed Ms. Tempel he would "be recommending to the Board of Education that [Ms. Tempel's] employment with the School District of Waukesha be terminated." [ECF Dkt. #1, ¶61; ECF Dkt. #67, Aziere Decl. ¶14, Ex. L]. On July 12, 2023, the Board held a hearing on Dr. Sebert's recommendation to terminate Ms. Tempel. [ECF Dkt. #1, ¶63]. In a unanimous vote, the Board adopted Dr. Sebert's recommendation and terminated Ms. Tempel's employment with the District, effective July 12, 2023. [ECF Dkt. #1, ¶64].

## II.   PROCEDURAL BACKGROUND.

Following her termination, Ms. Tempel filed this action on September 5, 2023, in the United States District Court for the Eastern District of Wisconsin. Ms. Tempel's Complaint asserted a single claim under 42 U.S.C. § 1983, alleging that Appellees, acting under color of state law, violated her First Amendment rights by terminating her public employment in retaliation for protected speech. [ECF Dkt. #1]. The matter was assigned to Magistrate Judge Nancy Joseph.

The parties engaged in extensive discovery, and, on February 21, 2025, they filed cross-motions for summary judgment. On September 29, 2025, the District Court granted Appellees' motion for summary judgment and denied Appellant's cross-

motion. [ECF Dkt. #107]. The court entered judgment in Appellees' favor and dismissed the action in its entirety. [*Id.*].

In its decision, the District Court held Ms. Tempel was speaking as a private citizen on a matter of public concern. [ECF Dkt. #106, pp. 11-16]. Based on the undisputed facts, however, the court applied the balancing test articulated in *Pickering v. Board of Education*, 391 U.S. 563 (1968), weighing Ms. Tempel's interest in her speech against the District's interest in maintaining effective and efficient public operations. [*Id.* at 16-22].

The District Court correctly concluded Ms. Tempel's speech did not arise from any "specialized knowledge" warranting heightened First Amendment protection. [*Id.* at 21-22]. Instead, the undisputed record demonstrated Ms. Tempel's speech entered an already existing public debate—namely, discussion surrounding the District's application of its Controversial Issues Policy. [*Id.*]. The court also considered the undisputed fact Ms. Tempel chose a public, highly amplifying medium for her speech, substantially increasing its reach and impact. [*Id.* at 20].

The District Court properly weighed Ms. Tempel's amplified speech against its consequences, including severe disruption to District operations. [*Id.* at 16-22]. Ultimately, the lower court recognized significant safety concerns, operational disruption, and internal disharmony experienced by the District resulted directly from the message Ms. Tempel chose to amplify publicly. [*Id.*]. As a result, Plaintiff's choice of

speaking on a public social media platform weighed against her in this case because it caused significant disruption to her place of employment. In arriving at the decision, the District Court analogized this case to that recently decided by this Court in *Hedgepeth v. Britton*, 152 F.4th 789 (7th Cir. 2025). [ECF Dkt. #106, pp. 20-22].

Ms. Tempel now appeals, seeking reversal of the District Court's grant of summary judgment in Appellees' favor.

## <u>SUMMARY OF THE ARGUMENT</u>

As a public employee, to prevail on her First Amendment retaliation claim, Ms. Tempel must show her speech was made as a private citizen on a matter of public concern. Even when that threshold is met, a governmental employer may impose certain restraints if "the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the governmental employer in promoting effective and efficient public service."

The District Court properly granted summary judgment for Appellees. While it erroneously concluded Ms. Tempel's tweets and media interviews constituted private-citizen speech on a matter of public concern, the District Court correctly held, under *Pickering*, the District's interest in maintaining effective, secure, and orderly public schools substantially outweighed Ms. Tempel's interest in her speech.

Ms. Tempel now appeals, challenging the District Court's decision for several reasons. Of course, Ms. Tempel does not challenge the lower court's finding Ms.

Tempel's speech was made as a private citizen on a matter of public concern. But Ms. Tempel takes several issues with the District Court's finding Appellees' interest in maintaining public services outweighed Ms. Tempel's interest in her protected speech.

As to the first issue (i.e., whether Ms. Tempel was speaking as a private citizen on a matter of public concern), while not challenging the lower court's ultimate decision to grant summary judgment in its favor, Appellees assert the decision may be affirmed on the independent basis that the record establishes Ms. Tempel's speech was not protected because she was not speaking on a matter of public concern.

The undisputed facts show Ms. Tempel repeatedly framed her speech as a District teacher, referenced her classroom and students, and tagged the District directly. She admitted under oath she always speaks "as a teacher." Her social media posts never mention the Controversial Issues Policy or even make reference to it. Her issue is limited to the song selection for a first-grade concert, which is a personal workplace grievance and not a matter of public concern. But even if one were to find a connection to the Controversial Issues Policy, Ms. Tempel's speech still is not protected because she created a purely false narrative which she then alleged was a matter of public concern. But because her narrative was completely factually inaccurate and contributed no meaningful information to any broader public debate, it is not protected speech.

As to the second issue (i.e., substantial disruption), Ms. Tempel makes several challenges to the District Court's *Pickering* analysis. First, Ms. Tempel argues the lower

17

court undervalued her speech by concluding it did not reflect "specialized knowledge," by allegedly improperly discounting Ms. Tempel's interest because she was a public-school teacher, and by assigning diminished weight to speech made through social media. Second, Ms. Tempel contends the lower court overstated the District's interests by misapplying the summary judgment standard, failing to conduct a meaningful balancing analysis, overemphasizing disruption and disharmony, crediting what she characterizes as "speculative" evidence of disruption, and disregarding asserted non-speech-related grounds for her termination.

None of these arguments withstands scrutiny. The District Court correctly determined Ms. Tempel's speech did not reflect "specialized knowledge," but instead repeated an existing controversy without providing informed or insider perspective. Given the speech's admitted inaccuracies, no basis exists to assign heightened constitutional weight as expert or uniquely valuable commentary. Ms. Tempel's claim the lower court improperly diminished her interest based on her role as a public-school teacher likewise mischaracterizes the decision. The lower court did not penalize Ms. Tempel for serving as a teacher; it appropriately framed the analysis within the public-education context, where maintaining public trust and institutional stability remains essential. This contextual framing is required under *Pickering*, not any wrongful reduction of speech rights. Finally, the lower court's recognition social media can

18

amplify both speech and disruption only follows this Honorable Court's precedent and was a proper consideration in the balancing.

Ms. Tempel's challenges to the District Court's assessment of the District's interests fare no better. The lower court applied the correct summary judgment standard, assigning the proper burdens upon the Appellees. It also conducted an accurate and comprehensible *Pickering* balancing test. The scale favored the District because the undisputed record demonstrated substantial disruption resulting from Ms. Tempel's speech. The District faced a flood of violent and hostile communications, significant security concerns, and widespread operational strain. Employee harmony suffered as colleagues endured the fallout from Ms. Tempel's false narrative. These harms were concrete, documented, and also reasonably foreseeable rather than speculative.

The District Court's ultimate decision is sound. As a result, this Court should affirm the grant of Appellees' Motion for Summary Judgment.

## ARGUMENT

### I.     STANDARD OF REVIEW.

This Court reviews the District Court's order granting summary judgment to the District de novo, drawing all reasonable inferences in Ms. Tempel's favor. *Hicks v. Ill. Dep't of Corr.*, 109 F.4th 895, 900 (7th Cir. 2024). The District Court's order can be affirmed on any ground supported by the record. *See Hoffstead v. Ne. Reg'l Commuter*

*R.R. Corp.*, 132 F.4th 503, 514 (7th Cir. 2025) (citations omitted). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof").

"Material facts" are those that, under the appropriate substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1968). To determine whether a genuine issue of material fact exists, courts must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict in her favor.'" *Id.* (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

20

To succeed on a First Amendment retaliation claim, a plaintiff must satisfy three essential elements: (1) she engaged in an activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity in the future; and (3) there exists a causal connection between the constitutionally protected conduct and the retaliatory action. *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010). If an employee establishes a prima facie case of retaliation, the burden then shifts to the employer to show the same actions would have occurred absent the protected speech. *Id.* at 674; *Spiegla v. Hull*, 371 F.3d 928, 942–43 (7th Cir. 2004).

It is well settled, a citizen who accepts public employment "must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006); *Pickering* 391 U.S. at 568. Thus, a public employee's speech is constitutionally protected by the First Amendment "*only* when [s]he speaks 'as a citizen' on matters of public concern." *Roake v. Forest Preserve District of Cook County*, 849 F.3d 342, 346 (7th Cir. 2017) (emphasis added). And, even then, if citizen speech addresses a matter of public concern, a governmental employer may impose certain restraints if "the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the governmental employer in promoting effective and efficient public service." *Garcetti*, 547 U.S. at 419; *McGreal v. Ostrov*, 368 F.3d 657, 675-76 (7th Cir. 2004).

II.     THE DISTRICT COURT'S JUDGMENT SHOULD BE AFFIRMED BECAUSE MS. TEMPEL DID NOT SPEAK ON A MATTER OF PUBLIC CONCERN.

The District Court correctly entered summary judgment for the District. Although the lower court resolved the case under *Pickering,* the judgment may be affirmed on the threshold ground that Ms. Tempel did not engage in protected speech to begin with. The record independently establishes she did not speak on a matter of public concern. Rather, Ms. Tempel was voicing a personal workplace grievance regarding the song selection for a first-grade concert. Furthermore, Ms. Tempel created a false narrative alleging the District had engaged in a war on rainbows. Ms. Tempel cannot fabricate the matter, then assert said matter is of public concern. And because Ms. Tempel cannot satisfy this critical element of a First Amendment retaliation claim, this Court may affirm the lower court's decision on that basis.

When Ms. Tempel took to social media, she did so as a teacher, because "she is always a teacher" and she did so expressly identifying herself as a teacher for the District. [ECF Dkt. #48, Tempel Tr., 98:2 – 99:15]. In her March 21, 2023 tweet, Ms. Tempel, under the name "Maestra Melissa"[1] and tagging the District, wrote: "*My* first graders were so excited to sing Rainbowland for *our* spring concert but it has been vetoed by *our* administration." She even testified during her deposition "I was referring to the students that I teach in the School District of Waukesha" when she posted the tweet. [ECF Dkt. #48, Tempel Tr., 100:19-25].

---

[1] "Maestra" is a Spanish word commonly used to describe a female teacher.

Ms. Tempel followed the initial tweet with several additional tweets explicitly identifying herself as a teacher for the District. When asked to identify the spring concert location, she responded with a tweet saying "At Heyer Elementary School." [ECF Dkt. #48, Tempel Tr., 101:1-5]. When asked why she included "@waukeshaschools" in her tweet, Ms. Tempel testified it was because she wanted the public to know what was happening in *her* first-grade classroom in the Waukesha School District. [ECF Dkt. #48, Tempel Tr., 106:3-7].

Not once during any of these tweets did Ms. Tempel directly mention the Controversial Issues Policy. [*See generally* ECF Dkt. #67, Aziere Decl. ¶13, Ex. K]. Instead, Ms. Tempel focused solely on how upset she was by the decision regarding song selection for the first-grade concert. [*Id.*]. This was purely a personal issue and a personal grudge harbored by Ms. Tempel. And if a public employee speaks "upon matters only of personal interest," the expression of that speech and any alleged retaliation against the speaker is not a matter appropriately reviewed by federal courts. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also Marshall v. Allen*, 984 F.2d 787, 795 (7th Cir.1993).

Whether a government employee's speech addresses a matter of public concern depends upon "the content, form, and context of [the speech] as revealed by the whole record." *Gustafson v. Jones*, 290 F.3d 895, 906–07 (7th Cir. 2002) (citations omitted). Here, the undisputed facts showing Ms. Tempel's speech was rooted in a routine workplace

dispute—her dissatisfaction with an administrative decision regarding the selection of songs for her first-grade class's spring concert. This issue was entirely personal to Ms. Tempel, tied to her specific classroom, and concerned only her own self-interest as an employee.

Moreover, the matter upon which Ms. Tempel spoke was entirely fabricated. Ms. Tempel framed her discourse as exposing a "war on rainbows." [*See generally* ECF Dkt. #67, Aziere Decl. ¶13, Ex. K; *see also* ECF Dkt. #48, Tempel Tr., 32:1-22]. The record shows this framing rested on deliberate, or at the very least, reckless speculation rather than any *actual* insight gained through employment. Put simply, Ms. Tempel constructed a false narrative portraying the District as hostile toward rainbows and then leveraged that narrative to elevate her speech to a matter of public concern. She advanced a fictitious agenda designed to galvanize opposition to the District.

Ms. Tempel's speech in this case was pure fabrications that were either (1) knowingly false or (2) made with a reckless disregard for the truth. Either way, falsehoods typically do not bode well in First Amendment legal analysis and are often sitting outside the core protections. *See Brown v. Hartlage,* 456 U.S. 45, 60 (1982); *see also Pickering* 391 U.S. 563, fn. 6 (providing, "[b]ecause we conclude that appellant's statements were not knowingly or recklessly false, we have no occasion to pass upon the additional question whether a statement that was knowingly or recklessly false would, if it were neither shown nor could reasonably be presumed to have had any

harmful effects, still be protected by the First Amendment."). "Even outside the public employment context, the First Amendment does not protect false statements that are made with knowledge that they are false or with reckless disregard for the truth." *Thomas v. Ragland*, 324 F. Supp. 2d 950, 968 (W.D. Wis. 2004) (citing *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).

It bears reiteration, the undisputed record unequivocally shows Ms. Tempel fabricated numerous details about the Rainbowland decision when she first took to social media. Various fabrications and/or false statements are identified below.

> i.  *Fabrication 1: "My first graders were so excited to sing Rainbowland for our spring concert but it has been vetoed by our administration." [ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 1].*

During her deposition, Ms. Tempel admitted she had no actual evidence to support this assertion. Ms. Tempel admitted no one at the District used the words "veto" or "ban" and she never spoke to Principal Schneider to seek an explanation for the decision to not sing Rainbowland at the spring concert. [ECF Dkt. #48, Tempel Tr. 102:1-25]. In fact, Ms. Tempel expressly admitted she made this post based purely on her own assumptions, without having any factual support. [ECF Dkt. #48, Tempel Tr. 104:13-16].

> ii. *Fabrication 2: "The song Rainbow Connection from the Muppet Movie has also been taken off our spring concert list."  [ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 2].*

At the time she made this tweet, Ms. Tempel had received Mr. Ziegler's March 21, 2023, email stating, "Rainbowland is out. Rainbow Connection is in." [ECF Dkt. #33, Schneider Tr., 42:16-19; ECF Dkt. #67, Aziere Decl. ¶9, Ex. G; ECF Dkt. #60, ¶15]. On that same day, Mr. Ziegler spoke with Ms. Tempel and Ms. Aranda and explained Principal Schneider took issue with Rainbowland because he questioned whether Miley Cyrus was appropriate for first graders. [ECF Dkt. #60, ¶16]. In addition, Ms. Tempel admitted she never spoke with Principal Schneider, with Dr. Sebert, or with anyone in administration to obtain any information to verify this false assertion. [ECF Dkt. #48, Tempel Tr. 110:14 – 111:3].

> iii. *Fabrication 3: "Today they banned Rainbow Connection, so it seems the reason is rainbows." [ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 3].*

At the time she made this tweet, Ms. Tempel had received Mr. Ziegler's March 21, 2023, email stating, "Rainbowland is out. Rainbow Connection is in." [ECF Dkt. #33, Schneider Tr., 42:16-19; ECF Dkt. #67, Aziere Decl. ¶9, Ex. G; ECF Dkt. #60, ¶15]. During her deposition, Ms. Tempel admitted no one from the District used the word "banned." [ECF Dkt. #48, Tempel Tr. 111:14-15]. Ms. Tempel admitted she never spoke with anyone in administration to obtain any information to verify this false assertion. [ECF Dkt. #48, Tempel Tr. 111:16 – 112:2]. Once again, Ms. Tempel admitted she had no

actual evidence to support this assertion and, instead, purely made an assumption. [ECF Dkt. #48, Tempel Tr. 112:21-22]. Ms. Tempel also admitted <u>she</u> created the narrative that rainbows were the issue. [ECF Dkt. #48, Tempel Tr. 112:23 – 113:1].

> iv.    *Fabrication 4: "Rainbow Connection was unbanned today after parents sent e-mail to admin." [ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 5].*

During her deposition, Ms. Tempel admitted no one at the District told her Rainbow Connection was "unbanned." [ECF Dkt. #48, Tempel Tr. 114:20 – 115:4]. Furthermore, Ms. Tempel admitted she did not have any direct knowledge regarding the truth of anything asserted in this specific post. [ECF Dkt. #48, Tempel Tr. 115:5 – 117:13].

> v.    *Fabrication 5: "They did ban Rainbow Connection, but then they unbanned it." [ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 18].*

By this point, Ms. Tempel was aware the decision not to sing Rainbowland was based on concerns whether the artist (i.e., Miley Cyrus) was appropriate for first grade students, and had nothing to do with the song's lyrics. [ECF Dkt. #48, Tempel Tr. 122:18 – 123:23]. Ms. Tempel admitted that, despite this knowledge, she took no steps to ascertain the basis for any decision by the District and still had no evidence Rainbow Connection had ever been banned. [ECF Dkt. #48, Tempel Tr. 128:3-17].

In light of the falsehoods Ms. Tempel admitted during her deposition, it is clear she manufactured a narrative portraying the District as opposing rainbows. At best, Ms. Tempel exhibited a reckless disregard for the truth when she created this narrative. At worst, Ms. Tempel flat out lied. In either case, she forged a false narrative.

Ms. Tempel's misstatements are not minor inaccuracies or good-faith errors. They are deliberate distortions designed to provoke public outrage and cast the District in a false light. Ms. Tempel's tweets were not "innocent," but purposely crafted to incite outrage, irrespective of the truth. [*See generally* ECF Dkt. #67, Aziere Decl. ¶13, Ex. K]. No matter of public concern exists where speech describe an application of a policy which *never* occurred. The District did not "ban" Rainbowland from the concert for the reasons Ms. Tempel publicly asserted. The actions Ms. Tempel attributed to the District simply did not happen.

What Ms. Tempel presented to a national audience through her tweets was not evidence or insight, but a fairytale story, one the record simply does not support. As a result, Ms. Tempel's speech was not made to address a genuine matter of public concern. As such, the lower court's judgment may be affirmed on the independent basis that Ms. Tempel was not engaged in protected speech under the First Amendment.

III. **THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO THE DISTRICT BECAUSE, UNDER THE *PICKERING* BALANCING TEST, THE DISTRICT'S INTEREST SUBSTANTIALLY OUTWEIGHS APPELLANT'S INTEREST. [2]**

Even in finding Ms. Tempel's speech protected, the District Court properly applied the *Pickering* balancing test and determined Ms. Tempel's interest in her protected speech was substantially outweighed by the District interest in promoting

---

[2] In addressing the arguments contained herein, Appellees do not concede Ms. Tempel was, in fact, speaking on a matter of public concern. However, even if this Honorable Court were to so decide, the lower court still properly granted Appellee's motion for summary judgment by correct application of the *Pickering* test as set forth herein.

efficient and effective public services. As discussed above, a governmental employer may impose certain restraints if "the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the governmental employer in promoting effective and efficient public service." *Garcetti*, 547 U.S. at 419; *McGreal*, 368 F.3d at, 675-76.

In reaching this decision, the District Court explained, under *Pickering*, an employer bears the burden of establishing its interest in workplace efficiency outweighs an employee's right to speak. [ECF Dkt. #106, pp. 16-17] (citing *Hedgepeth*, 2025 WL 2447077, at *4). The District Court also correctly recognized this Court has provided a nonexclusive list of seven factors that *may* be relevant to *Pickering* balancing:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

[*Id.*] (citing *Darlingh v. Maddaleni*, 142 F.4th 558, 565–66 (7th Cir. 2025)).

Notably, however, these factors are not mandatory in every case. *Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025). Rather, this Court instructs it is "more meaningful to focus on the specific considerations that bear weight in evaluating the competing interests in the specific context of th[e] case." *Id.*

In this case, the District Court appropriately framed its analysis within the context of public education, an environment where effective functioning remains paramount:

> In the context of public education, "the critical focus of each factor is the effective functioning of the public employer's enterprise"; thus, "[i]nterference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function, so avoiding such interference can be a strong state interest." *Hedgepeth*, 2025 WL 2447077, at *4 (internal quotation and citation omitted). The level of disruption needed to justify a restriction, however, varies with context. *Id*. "The more serious and politically charged the message, the stronger the government's justification must be." *Id*. Further, employers enjoy "more leeway in restricting the speech of a public-facing employee like a classroom teacher who must maintain public trust and respect to be effective." *Id.* (internal quotation and citation omitted). And finally, "the time, place, and manner of the speech factor into the overall analysis." *Id*.

[ECF Dkt. #106, p. 17].

Thus, at the outset, the District Court applied the correct analytical framework before engaging in the *Pickering* balancing analysis. The lower court then properly applied the relevant *Pickering* factors to the undisputed facts and correctly concluded Appellees' interests outweighed those of Ms. Tempel.

Ms. Tempel raises several challenges to the District Court's *Pickering* analysis. [Dkt. #11, pp. 27-51]. First, Ms. Tempel contends the District Court undervalued her speech interest from the outset by rejecting her claim of "specialized knowledge." [*Id.*, at 28-29]. Ms. Tempel further asserts the lower court improperly diminished her First Amendment protections by recognizing her role as a public-facing teacher and

30

incorrectly weighed her use of social media against her rather than in her favor. [*Id.*, at 29-32].

Second, Ms. Tempel argues the District Court overstated Appellees' interests by failing to apply the proper summary judgment standard, inadequately balancing competing interests, overstating alleged disruption and disharmony, assigning excessive weight to unsupported claims of disruption, and disregarding alternative grounds for her termination apart from disruption allegedly caused by her speech. [*Id.*, at 32-47].

As explained below, each of Ms. Tempel's arguments fail.

A.     **The District Court Properly Valued Ms. Tempel's Interest When Conducting Its *Pickering* Analysis.**

1.     *The District Court Correctly Concluded Ms. Tempel's Speech Did Not Arise From Specialized Knowledge.*

This Court has recognized limited circumstances where a teacher's speech interest receives presumptive weight under *Pickering*, particularly when the speech arises from specialized knowledge gained through public employment. *See Hedgepeth v. Britton*, 152 F. 4th 789 (7th Cir. 2025) (citing *Pickering* 391 U.S. at 572). For example, in *Pickering*, the Supreme Court opined that "[t]eachers are ... the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent." *Id.* As a result, it is of the utmost public interest to ensure teachers be able to speak on such a topic without fear of retaliation. *Id.*

This case presents no such circumstances. Here, the District Court correctly determined Ms. Tempel lacked any specialized knowledge warranting heightened First Amendment protection. [ECF Dkt. #106, pp. 21-22]. As the court explained:

> Special knowledge contemplates situations where an employee gains knowledge through her status as a public employee that is vital to public decision-making, such as when an employee learns of misconduct and brings the issue to light or testifies to the existence of corruption in the allocation of public funds. Tempel, in contrast, did not have "special knowledge" gained from her employment that would assist the public in decision-making. On the contrary, she asserts that she spoke out after "years of sustained public criticism of, and media attention about, the District's Controversial Issues Policy." In other words, though the public did not specifically know of the Rainbowland controversy before Tempel's tweets, the public already had knowledge of controversy surrounding the District's policies affecting LGBTQ+ rights.

[*Id.*].

Ms. Tempel, nevertheless, asserts entitlement to heightened level of interests in the *Pickering* analysis on the theory her speech introduced "new information." [Dkt. #11, pp. 28-29]. The record plainly contradicts her claim.

Ms. Tempel concedes her speech entered an existing public debate. This is the exact argument Ms. Tempel uses to defend the District Court's ruling that she spoke on a matter of public concern. In her own words, "Ms. Tempel's speech contributed to nearly two years of heated public debate over [the District's] Controversial Issues Policy and treatment of LGBTQ+ issues." [Dkt. #11, p. 26]. In other words, Ms. Tempel criticized the District's decision to cancel a student performance of "Rainbowland" during an ongoing controversy concerning classroom symbols and LGBTQ+ inclusion.

Her speech neither initiated nor reframed public discourse. Ms. Tempel's speech in this case did not present *any* information to the public that would assist them in their decision-making. As Ms. Tempel puts it:

> Here, it is beyond dispute that Ms. Tempel spoke as a citizen on a matter of public concern when she took to social media to criticize SDW's decision to cancel a student performance of "Rainbowland" *at a time when SDW had already generated significant public controversy over its decision to strip classrooms of symbols that promoted inclusion for LGBTQ+ youth*.

[Dkt. #11, p. 19] (emphasis added).

Despite this admission, Ms. Tempel maintains she spoke from a position of "special knowledge" because she allegedly added "new information" to an issue already in the public eye. [*Id.,* at 28-9]. The record does not support her argument. Ms. Tempel testified her tweets were predicated on the fact she "knew of the District's controversial issues policy and the public's interest in it" and she "tweeted and conducted interviews with the news media about 'Rainbowland' because she believed that the public had a right to know about the District's "Rainbowland" decision, as it was another application of the Controversial Issues policy." [ECF Dkt. #64, ¶¶59-60].

Ms. Tempel cannot simultaneously argue her speech joined a long-running public debate to satisfy her speech being on a matter of public concern and also claim her commentary transformed into speech grounded in "special knowledge" under *Pickering*. As she repeatedly acknowledges—and emphasizes—the public already understood the Controversial Issues Policy and its impact on classrooms. [Dkt. #11, p.

19]. Commentary on an established controversy does not constitute specialized knowledge warranting heightened weight under *Pickering*. *See Hedgepeth*, 152 F.4th at 798.

Moreover, Ms. Tempel's statements did not fundamentally derive from insight gained through her employment, nor did they disclose novel or otherwise unavailable information. Her speech derived from her prior, public, knowledge of the District's Controversial Issues Policy, which she then used to speculate why certain songs did not get included in the spring concert. [Dkt. #11, pp. 19, 28-29].

Ms. Tempel's reliance on *Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025) is misguided. In *Darlingh* a school guidance counselor's professional perspective on gender-identity issues carried particular significance because of the counselor's role working directly with students on sensitive personal matters.[3] Ms. Tempel, by contrast, served as a first-grade classroom teacher commenting on secondhand knowledge of a spring concert song selection. Her position as a formal educational instructor does not entail the same responsibilities or institutional role as a guidance counselor, and her commentary in this case does not merit comparable weight under *Pickering*.

Rather, the undisputed facts show Ms. Tempel's speech addressed another example of policy application within an already-active debate. That is all her statements

---

[3] "Guidance Counselor" is defined as "a person who gives help and advice to students about educational and personal decisions." Merriam-Webster, https://www.merriam-webster.com/dictionary/guidance%20counselor (last visited Feb. 3, 2026).

did. It is undisputed the District already faced widespread public attention, criticism, and support concerning its Controversial Issues Policy and classroom implementation. Ms. Tempel's statements, albeit inaccurate statements, fit squarely within that ongoing discussion. As a result, her speech did not arise from specialized knowledge and does not warrant heightened First Amendment protection.

Ms. Tempel's speech in this case was not verified, insightful, or even accurate. As a result, the District Court appropriately declined to allocate heightened interest to Ms. Tempel's speech as arising from "special knowledge."

### 2.  The District Court Applied The Correct First Amendment Standard To Ms. Tempel When Conducting Its First Amendment Analysis.

"[P]ublic school teachers occupy a unique position of trust." *Hedgepeth*, 152 F.4th at 798 (citations omitted). The District Court properly acknowledged this principle as part of its *Pickering* analysis, explaining:

> The court has "repeatedly recognized that public school teachers occupy a unique position of trust"; thus, employers have "more leeway in restricting the speech of a public-facing employee like a classroom teacher who must maintain public trust and respect to be effective." *Hedgepeth*, 2025 WL 2447077, at *4, 6.

[ECF Dkt. #106, p. 21].

Despite the District Court properly recognizing good law, Ms. Tempel now argues the District Court "erred by downgrading Ms. Tempel's interest in speaking—and therefore the protection for her speech—simply because she is a public-school

teacher who 'must maintain public trust and respect to be effective.'" [Dkt. #11, p. 29]. Ms. Tempel's argument is tenuous at best.

The District Court did not "diminish" Ms. Tempel's speech interests. Instead, it correctly framed the *Pickering* inquiry within the context of public education, where effective functioning of the employer remains central. As the court explained:

> In the context of public education, "the critical focus of each factor is the effective functioning of the public employer's enterprise"; thus, "[i]nterference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function, so avoiding such interference can be a strong state interest." *Hedgepeth,* 2025 WL 2447077, at *4 (internal quotation and citation omitted). The level of disruption needed to justify a restriction, however, varies with context. *Id.* "The more serious and politically charged the message, the stronger the government's justification must be." *Id.* Further, employers enjoy "more leeway in restricting the speech of a public-facing employee like a classroom teacher who must maintain public trust and respect to be effective." *Id.* (internal quotation and citation omitted). And finally, "the time, place, and manner of the speech factor into the overall analysis." *Id.*

[ECF Dkt. #106, p. 17].

This reflects proper application of governing law rather than any impermissible reduction of Ms. Tempel's speech interests. Nothing in the decision suggests the District Court discounted Ms. Tempel's interests due to her profession. The lower court simply applied the correct legal standard to a classroom teacher operating in a highly public-facing role.

It is undisputed by both parties Ms. Tempel's speech in this case garnered national, regional, and local media coverage, including Ms. Tempel participating in

several media interviews. [ECF Dkt. #69, ¶¶28-29; ECF Dkt. #64, ¶¶64-65]. Her actions were met with both positive and negative feedback by the District's community. As this Honorable Court recognized in *Hedgepeth,* the negative feedback to the posts, "including current student who predicably saw her posts, 'are not outsiders seeking to heckle [Ms. Tempel] into silence, rather they are participants in public education, without whose cooperation public education as a practical matter cannot function.'" *Hedgepeth*, 152 F.4th at 799.

Community support does not alter this analysis. Even where some community members expressed approval of Ms. Tempel's action, school officials may reasonably conclude strong negative reactions exist and risk internal disruption. *See Id.* (citing *Melzer v. Bd. of Educ. of the City Sch. Dist. of N.Y.*, 336 F.3d 185, 198 (2d Cir. 2003) (finding, "just because 'some parents and students expressed support for [Ms. Tempel] as a person harmlessly expressing [her] ideas," it can still be "entirely reasonable for the Board to believe that many parents and students had a strong negative reaction to [her], and that such a reaction caused the school to suffer severe internal disruption.").

The District Court applied the correct legal standard when conducting the *Pickering* analysis in the context of public education. Ms. Tempel cannot get around the fact she was a public-facing classroom teacher whose effectiveness depended on maintaining public trust and respect. Thus, the District Court properly considered this reality within the *Pickering* framework.

      ***3.   The District Court Correctly Found Ms. Tempel's Widespread Use of Social Media and Media Outlets Amplified Her Speech In A Manner That Significantly Increased the Risk of Disruption.***

Public employees' use of social media can amplify their message while simultaneously magnifying the potential disruption to their employer. *Hedgepeth*, 152 F.4th at 798. The District Court correctly applied this principle in evaluating Ms. Tempel's conduct:

> Additionally, Tempel's method of speech further weighs in favor of the District. While speech made outside of the workplace may be less disruptive to the efficient functioning of the employer, as the Seventh Circuit noted, speech made on social media can carry a "clear risk of amplification" and therefore disruption. *See Hedgepeth*, 2025 WL 2447077, at *6; *see also Liverman v. City of Petersburg,* 844 F.3d 400, 407 (4th Cir. 2016) ("A social media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency.").

[ECF Dkt. #106, p. 20].

Ms. Tempel contends, "[t]he fact that Ms. Tempel used a medium of speech that enabled her to reach the public should elevate, rather than compromise, the protection she receives." [Dkt. #11, p. 32]. In support of her argument, Ms. Tempel interprets this Court's precedent in *Hedgepeth* to mean social media only weighs against the employee if the speech is "inflammatory." [*Id.*, at 31]. This is inconsistent with this Court's decision in *Hedgepeth*. There, this Court's analysis did not hinge on whether the speech was inflammatory; it focused on the risk of disruption created by the employee's posts:

38

Her posts, though not technically public, functioned more like a stage whisper than a secret. Thus, even drawing inferences in her favor, the posts predictably and rapidly circulated within the PHS community, including among current students and faculty, and shaped public perception of her as a teacher.

*Hedgepeth*, 152 F.4th at 798.

Thus, this Court's analysis hinges on the chance of disruption caused by the employee's speech. And, unlike the private posts on Hedgepeth's social media account, Ms. Tempel here actively amplified her speech. She used social media, participated in multiple media interviews, gave statements for news articles, tagged the District in her posts, and identified herself as a teacher. Many of her posts also tagged high-profile national accounts, including celebrities such as Miley Cyrus and Dolly Parton.

Again, Ms. Tempel's tweets were not "innocent," but purposely crafted to incite outrage, irrespective of the truth. [*See generally* ECF Dkt. #67, Aziere Decl. ¶13, Ex. K]. For instance, on March 28, 2023, Ms. Tempel responded to a March 26, 2023, post by @David803288441:

@David803288441: Why are you trying to shove a gay agenda down the throats of elementary kids? If you tried doing that to one of my kids [sic] I'd be marching myself in front of the school board to get you fired. Good in [sic] the school board there in Wisconsin.

Ms. Tempel: That's ridiculous. The gay agenda is much too long to fit down anyone's throat!

[ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 37].

And on March 30, 2023, Ms. Tempel posted the following tweet using the hashtag "#rainbowland":



ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 45]. On that same day, Ms. Tempel responded to a March 30, 2023, post by @TeachingIdeas:

> @TeachingIdeas: Quick Question [.] What is your favorite subject or topic to teach?

> Ms. Tempel: Civil Rights. Well actually, rainbows.

[ECF Dkt. #67, Aziere Decl. ¶13, Ex. K, p. 52].

These actions predictably and rapidly fueled disruption within the District. The manner in which Ms. Tempel used social media not only amplified her false narrative but directly contributed to operational and reputational disruption. The District Court correctly weighed this factor in the *Pickering* analysis.

**B.** **The District Court Properly Valued The District's Interest When Conducting The Pickering Balancing.**

**1. The District Court Applied The Correct Summary Judgment Standard.**

Ms. Tempel argues the District Court erred in favoring the Appellees' interest in this case because it failed to require the Appellees to prove "'particularly convincing reasons' for suppressing [Ms. Tempel's] speech." [Dkt. #11, p. 33]. Generally speaking, Ms. Tempel's argument in this respect can be distilled down to challenging the District Court allegedly "simply accepted at face value SDW's claims about the existence and severity of the supposed disruptions, without requiring significant proof, and disregarded contrary evidence." [*Id.*].

As will be explained in more detail below, Ms. Tempel's argument overlooks the *actual* and detailed evidence considered by the District Court. The District Court expressly considered extensive evidence regarding disruption following Ms. Tempel's tweets. [ECF Dkt. #106, p. 18]. This included weighing evidence from numerous District staff members, messages and calls received by the District, and reasonably predicted future disruptions following Ms. Tempel's speech. [*Id.* at 18-21].

**2. The District Court Properly Conducted The Pickering Balancing Test.**

The Supreme Court has made clear the *Pickering* test is necessary to ensure government employees retain their individual rights to free expression while allowing public employers to fulfill their duties effectively. *Pickering*, 391 U.S. at 568. Further, "[i]n performing the balancing, the statement will not be considered in a vacuum; the

manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Put differently, an employer's decision to terminate an employee survives First Amendment scrutiny if there was "an adequate justification" for the termination. *Garcetti*, 547 U.S. at 418

The *Pickering* balancing test does not require a court to conduct an exhaustive analysis of each individual *Pickering* factor. *Darlingh*, 142 F.4th at 565–66. Nevertheless, the District Court undertook a thorough and careful balancing of the relevant considerations.

The District Court acknowledged Ms. Tempel's speech addressed "important public matters" and occurred through a personal account outside school hours and off school grounds. [ECF Dkt. #106, pp. 20–21]. The time and place of the speech weighed in Ms. Tempel's favor. The court then balanced this factor against the manner of the speech, finding Ms. Tempel's posts "predictably attracted widespread attention and criticism of the school," and her identification as a teacher "only increased the statements' attention." [*Id.*, at 20]. This consideration weighed in favor of the District, particularly within the public-education context.

The District Court also considered whether Ms. Tempel's speech interfered with discipline or harmony among coworkers. [*Id.* at 19-20]. Based on undisputed evidence, the court found "the record supports the existence of discord and distraction among

staff members in the wake of Tempel's tweets." [*Id.*, at 19]. This factor weighed against Appellant.

The lower court also evaluated Ms. Tempel's assertion her speech contributed to debate vital to informed public decision-making. [*Id.*, at 21-22]. The District Court determined, because Ms. Tempel lacked "special knowledge" gained through employment, that her speech does little to assist public decision-making. [*Id.*]. As explained above, Ms. Tempel only provided fabricated commentary to an ongoing matter of public concern, so she did not add any new vital information to the public discourse.

After weighing these considerations, the District Court concluded:

> The undisputed facts show that Tempel's tweets resulted in substantial disruption to the school and District. Thus, weighing the factors relevant to *Pickering* balancing, I find that the District's interest in workplace efficiency outweighs Tempel's First Amendment interest in expression.

[ECF Dkt. #106, p. 22].

The District Court properly applied the *Pickering* framework by considering coworker disharmony, Ms. Tempel's role as a public-facing classroom teacher, the time, place, and manner of the speech, the speech's relationship to an ongoing public controversy, and the absence of speech vital to informed decision-making. The resulting conclusion—Appellees' interest in maintaining efficient and effective public services outweighed Ms. Tempel's speech interest—rests on undisputed facts and clear

application of the *Pickering* framework. Put differently, the *Pickering* balancing test overwhelmingly supports the District's decision.

The undisputed facts demonstrate Ms. Tempel's speech caused substantial disruption not only at Heyer Elementary School but throughout the District. Ms. Tempel deliberately sought national attention for her misleading claims, stating she hoped her posts would "gain national attention." [ECF Dkt. #1, ¶¶ 41, 60; *see also* ECF Dkt. #48, Tempel Tr. 104:17-106:7]. She succeeded, and as a direct result, the District received an influx of approximately 85 voicemails and hundreds of emails—many of them vulgar, threatening, and profane.

### 3. The District Court Did Not Err In Recognizing The Actual And Potential Disruption Resulting From Appellant's Speech.

Ms. Tempel challenges the District Court's conclusion recognizing substantial disruption and disharmony following Ms. Tempel's tweets. [Dkt. #11, pp. 35-39]. Ms. Tempel primarily attacks the District Court's reliance on this Court's decision in *Hedgepeth*, asserting material distinctions. [*Id.*]. According to Ms. Tempel, *Hedgepeth* involved "intemperate and inflammatory speech" prompting public concern over a teacher's fitness to teach, while Ms. Tempel's speech allegedly "disclosed facts about the operation of the school" and raised public concern regarding District conduct. [Dkt. #11, p. 36] (citing *Hedgepeth*, 152 F.4th at 793). In arriving to her conclusion, Ms. Tempel argues this Court in *Hedgepeth* relied on the fact Hedgepeth had prior disciplinary issues with the school. However, Ms. Tempel's reliance on Hedgepeth's discipline

record is misguided because the discipline history was not this Court's dispositive factor.

In *Hedgepeth*, Jeanne Hedgepeth, a social studies teacher at Palatine High School in Illinois, was terminated after posting comments on Facebook during the nationwide protests following George Floyd's death in 2020. *Hedgepeth*, 152 F.4th at 792-793. Hedgepeth's social media accounts were set to "private," but her posts visible to a large audience of former students and other community members. *Id.* at 793.

The school district conducted an investigation and found that Hedgepeth's actions violated multiple district policies. *Id.* at 794. Following a dismissal hearing in which the hearing officer found that Hedgepeth's posts were disruptive, the board of education voted to terminate Hedgepeth's employment. *Id.* Hedgepeth challenged her termination, arguing that her posts were protected under the First Amendment. *Id.* The district court disagreed, ruling in favor of the school district on summary judgment. Hedgepeth appealed to this Court. *Id*, at 799.

On Appeal, this Court affirmed the district court's decision, agreeing that the school district's interest in addressing disruptions and preventing future ones outweighed Hedgepeth's First Amendment interests. *Id*. The decision detailed the significant disruption caused by Hedgepeth's posts, including community outrage and media attention, which justified her termination. *Id.* at 797. In total, this Court's decision emphasized Hedgepeth's social media posts resulted in 113 emails about the posts and

the disruption "rippled through the entire community." *Id.* Hedgepeth's posts threw

school and district operations into disarray and unsettled her colleagues' classrooms. *Id.*

The posts sparked outrage, drew media attention, and forced the District into a costly

and time-consuming public relations response. This Court explained:

> The undisputed record further confirms that Hedgepeth's posts interfered
> with core District functions by diverting staff and resources to address
> widespread concerns from the community and the press. Given the scale
> of the fallout on top of Hedgepeth's prior disciplinary history, the District
> reasonably concluded that her conduct undermined her job performance.
> This is precisely the "interference with work, personnel relationships, or
> the speaker's job performance" that we have routinely recognized as
> constituting a "strong state interest."

*Id.* (citing *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013)).

*Hedgepeth* confirms consideration of an employee's disciplinary history remains

*permissible*, yet no rule limits public employers from acting when disruption arises from

an employee with no prior discipline. Instead, the governing inquiry centers on

interference with core operations, not disciplinary records. Despite Ms. Tempel's

attempt to distance this case from *Hedgepeth*, the District Court correctly applied the

analysis from *Hedgepeth*.

The parallels here prove unmistakable. Ms. Tempel's speech produced

disruption on a comparable scale—arguably worse. Following Ms. Tempel's tweets, the

District received approximately 85 voicemails and hundreds of emails, many vulgar,

profane, and threatening. [ECF Dkt. #67, Aziere Decl. ¶ 15, Ex. M]. Representative

messages included:

1. "Hey, I heard your school district doesn't like gay people. Fuck you, you fucking retards! Kill yourselves!"
2. "Religious based cultural ignorance-how stupid this is. You are small mindless assholes. Consider changing this or face the consequences,"
3. "You are a fucking cunt for working for that pig. Rot in hell!"

[ECF Dkt. #67, Aziere Decl. ¶15, Ex. M].

Those communications triggered immediate safety concerns. The timing of Ms. Tempel's posts further underscores the severity of the disruption. Her comments came in the wake of a school shooting in Nashville, Tennessee, which had heightened concerns about school safety nationwide. [ECF Dkt. #67, Aziere Decl. ¶2, Ex. B]. In this context, a flood of threats and hostility toward the District only exacerbated an already sensitive situation, making safety an even more pressing concern. One response to the District included a post referenced the Nashville shooting stating "let's pray it happens again! Let's pray there are twice as many victims this time." [*Id.*]. This post was referencing this individual's prayers the District be "plastered all over the national headlines for a major tragedy." [*Id.*]. As a result, despite Ms. Tempel's wish to downplay the impact on the District, the record reflects a reasonable belief national media exposure could prompt individuals to appear at Heyer Elementary, potentially causing disruption, protests, or threats to student safety.

This is not the equivalent to the "spurred media coverage" found in *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 518, 533 (2022). Appellant's attempt to analogous the disruption and safety concerns in this case to that in *Kennedy* should be quickly

disregarded. In *Kennedy*, it was determined the "sole reason" for the school's decision to suspend the plaintiff was its perceived "risk of constitutional liability." The *Kennedy* court found the school's correspondence to the plaintiff telling, where the school issued a letter to the plaintiff that "forbade Mr. Kennedy from engaging in "any overt actions" that could "appea[r] to a reasonable observer to endorse . . . prayer . . . while he is on duty as a District-paid coach." *Id.* at 518 (citations omitted). The evidence in *Kennedy* further supported the school issuing the letter to the plaintiff because "it judged that anything less would lead it to violate the Establishment Clause." *Id.* at 518. Thus, the evidence in that case did not support the disruption caused by the speech was even a reason for the employment decision. *See generally Id.*

Contrary to *Kennedy*, objective evidence demonstrates the District became inundated with emails, calls, voicemails, and in-person conversations immediately following Appellant's tweets. The undisputed record shows an increase of 20 to 30 calls per day, many abusive in nature, along with staff complaints following the posts. Such volume proved abnormal. [ECF Dkt. #67, Aziere Decl. ¶¶ 10–14]. Out of an abundance of caution, the District stationed a police officer outside the school. [ECF Dkt. #69, ¶¶53-55].

Ms. Tempel attempts to minimize disruption by arguing normal operations continued. [*See generally* Dkt. #11, pp. 42-45]. True, the District continued providing educational services. Yet continuity does not negate disruption. The record shows

48

District personnel worked around the clock to manage backlash, media inquiries, and safety concerns. [ECF Dkt. #69, ¶¶37-56]. The disruption extended into the classroom as well, where former first-grade teacher testified her classroom operations were forced to change following Appellant's publicity. [ECF Dkt. #49, Dellar Tr., 22:3-23:5, 65:10-22]. Even Ms. Brittany DeWindt, a former kindergarten teacher for the District, provided a declaration in the lower court proceedings, stating "[s]tudents had questions and wanted to talk about police. They seemed interested but not upset. *We discussed the police in my classroom*, at a kindergarten level, during the morning meeting." [ECF Dkt. #61, ¶13] (emphasis added). Claims suggesting routine duties continued "normally" mischaracterize reality and are inconsistent with the undisputed evidence.

Although no physical security incident ultimately occurred, thankfully, precedent still forecloses Ms. Tempel's argument. This Court has repeatedly recognized schools may act "to nip reasonable predictions of looming disruption in the bud," provided predictions rest on objective evidence rather than speculation., 152 F.4th at 796.

Ms. Tempel argues the District created disruption by unnecessarily inviting police presence to the school grounds. [Dkt. #11, p.42]. This argument is a red herring. This Court's precedent clearly permits "[s]chool officials can also act to nip reasonable predictions of looming disruption in the bud." *Hedgepeth*, 152 F.4th at 796 (citing *Khuans v. Sch. Dist.* 110, 123 F.3d 1010, 1014 (7th Cir. 1997). These predications must be

reasonable and supported on more than mere speculation. *Id.* (citing *Chaklos v. Stevens*, 560 F.3d 705, 715 (7th Cir. 2009) (citations omitted). Here, hundreds of threatening and profane messages provide ample justification.

In light of the provoking speech identified in Section III(A)(3) above, messages demanding action or warning to "face the consequences," combined with references to school violence, imposed an obligation to protect students. Caution under such circumstances deserves encouragement, not condemnation. This Court's caselaw recognizes this fact.

The District Court properly applied *Hedgepeth* and correctly recognized both actual and anticipated disruption flowing from Ms. Tempel's speech. The record overwhelmingly supports its conclusion.

### 4. The District Court Properly Considered the Undisputed Evidence Establishing Staff Disharmony Resulting from Appellant's Speech.

The *Pickering* balancing test permits consideration of "whether the speech would create problems in maintaining discipline or harmony among co-workers." *Darlingh*, 142 F.4th at 565 (citations omitted). The District Court correctly concluded Ms. Tempel's speech created significant disharmony among District staff. [ECF Dkt. #106, p. 19].

In assessing the record, the District Court credited testimony establishing staff experienced a level of discord unprecedented within the District. [*Id.*]. While workplace friction inevitably exists in any organization, witnesses described a marked escalation following Ms. Tempel's tweets. [*Id.*]. The lower court also noted "multiple emails from

staff members sent to Schneider and Sebert during spring break expressing concern for school safety and the negative attention Tempel's tweets could bring to the school." [*Id.*]. Plainly put, the undisputed facts show Ms. Tempel's actions caused substantial disruption to the District and fostered a work environment of disharmony among teachers. [ECF Dkt. # 33, Schneider Tr.,74:5-21, 129:23 – 130:15, 165:10-166:19; ECF Dkt. #49, Dellar Tr., 22:3-23:5, 65:10-22; ECF Dkt. #34, Chaparro Tr., 75:24-78:10]. Ms. Tempel's actions thus directly interfered with the District's ability to operate effectively and safely.

Contrary to Ms. Tempel's assertion, the District Court did not disregard evidence of preexisting tension. Instead, it recognized no prior episode produced comparable staff discord. [ECF Dkt. #106, p. 19]. This point remains undisputed and weighs strongly in the District's favor under *Pickering*. "As an employer, a governmental agency must have the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency." *Connick*, 461 U.S. at 151; *Khuans,* 123 F.3d at 1014.

The analysis also requires consideration of the nature of Ms. Tempel's speech. Ms. Tempel's statements consisted of fabricated claims riddled with inaccuracies and falsehoods. In *Pickering*, the Supreme Court expressly reserved judgment on First

Amendment protection for "knowingly or recklessly false" statements. *Pickering* 391 U.S. at fn. 5. Granting constitutional shelter—or significant weight under *Pickering*—to demonstrably false speech serves no practical or doctrinal purpose and is inconsistent with *Pickering's* progeny.

Here, Ms. Tempel's speech lacked factual accuracy, verification, and any foundation in specialized knowledge. The tweets fueled disruption, generated internal disharmony, and raised serious safety concerns. Under these circumstances, the District's interest in maintaining orderly, effective public operations outweighed Ms. Tempel's inflammatory commentary on an already ongoing public controversy.

Accordingly, the District Court properly applied the Pickering framework and reached the correct result.

### 5. *Ms. Tempel's Termination Was The Result Of Her Actions, Including The Disruption And Disharmony Resulting From Those Actions.*

Ms. Tempel's final challenge to the District Court's decision is the alleged failure to consider reasons for Ms. Tempel's termination unrelated to disruption. The District's policies are expressly designed to comply with First Amendment principles, ensuring its decisions do not improperly infringe upon constitutionally protected speech. In other words, if Ms. Tempel's speech were protected under the First Amendment, enforcing District policies would not violate her rights. Plaintiff's argument ignores this fundamental point.

At no point during the lifespan of this litigation has Ms. Tempel once analyzed the First Amendment in relation to the District's policies. Instead, she makes the unsupported argument her termination was "motived by hostility to her message and a desire to enforce a rule—one that is plainly unlawful under this Court's decision in *Knapp v. Whitaker*, 757 F.2d 827 (7th Cir. 1985)—that would prohibit any teacher from speaking publicly on any matter outside the School District's internal 'chain of command.'" [Dkt. #11, p. 46]. Put simply, Ms. Tempel is arguing that because she claims her speech is protected, the policies must necessarily be unconstitutional. This reasoning is legally and logically flawed.

It is undisputed Ms. Tempel was terminated for violating District policies—policies that are constitutional—not for engaging in protected speech. Her termination was a direct result of her actions, not an unconstitutional suppression of speech.

## CONCLUSION

Continuing to employ Ms. Tempel in light of her actions would have been an ongoing safety concern and enormous distraction to teaching and learning, as well as a strain on the relationships within the District and community. The District had a legitimate and compelling interest in mitigating this disruption and ensuring a safe learning environment. For the foregoing reasons, Appellees-Appellees respectfully request the Seventh Circuit affirm the decision of the District Court granting Defendants-Appellees' Motion for Summary Judgment.

Dated at Waukesha this 5th day of February, 2026.

Respectfully submitted,

_____/s/ Joel S. Aziere_____
Joel S. Aziere (WI Bar No.: 1030823)
jaziere@buelowvetter.com
Christina A. Katt (WI Bar No.: 1073979)
ckatt@buelowvetter.com
Hunter M. Cone (WI Bar No.: 1123048)
hcone@buelowvetter.com

**Buelow Vetter Buikema Olson & Vliet, LLC**
20855 Watertown Road, Suite 200
Waukesha, Wisconsin 53186
Phone: (262) 364-0300
Facsimile: (262) 364-0320

*Attorneys for Defendants-Appellees, School District of Waukesha and James Sebert*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because this document contains 12,657 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2016 in 12-point Palatino Linotype style font with 11-point Palatino Linotype style footnotes.

Dated:  February 5, 2026

*/s/ Joel S. Aziere*
Joel S. Aziere
Attorney for Defendants-Appellees

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2026, the Brief of Defendants-Appellees was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Joel S. Aziere*
Joel S. Aziere
Attorney for Defendants-Appellees